UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| SABINO LUIS LUIS, <br>　　　Petitioner, <br><br> v. <br><br> MICHAEL NESSINGER, *Warden of Wyatt Detention Facility*; DAVID T. WESLING,[1] *Director, ICE Boston Field Office*; DAVID VENTURELLA,[2] *Acting Director of ICE*; and MARKWAYNE MULLIN, *Secretary of Homeland Security*, <br>　　　Respondents. | No. 26-cv-279-JJM-PAS |

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Court Chief Judge.

Sabino Luis Luis has filed an Emergency Amended Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241.[3]  ECF No. 15.  He is currently being held in the custody of Immigration and Customs Enforcement ("ICE") at the Donald W. Wyatt Detention Facility (the "Wyatt") in Central Falls, Rhode Island.  ECF No. 1 at 2.  Mr. Luis was initially detained by ICE after being charged with state criminal offenses

---

[1] Pursuant to Fed. R. Civ. P. 25(d), David T. Wesling has been substituted for Patricia Hyde as ICE's Field Office Director of Enforcement and Removal Operations, Boston Field Office.

[2] Pursuant to Fed. R. Civ. P. 25(d), David Venturella has been substituted for Todd M. Lyons as Acting Director of ICE.

[3] Mr. Luis filed an initial Emergency Petition for Writ of Habeas Corpus, *see* ECF No. 1, which he has since amended to indicate the dismissal of criminal charges against him.

that have since been dismissed. *Id.*; *see also* ECF No. 15 at 3. He now argues that the dismissal of those charges "materially alters the factual and legal basis" for his detention, ECF No. 6 at 2, and that ICE's decision to keep him in custody "raises serious constitutional concerns under the Due Process Clause." ECF No. 15 at 4. The Government opposes Mr. Luis' Petition, raising jurisdictional arguments and asserting that Mr. Luis "fail[s] to state a claim for a due process violation." ECF No. 10 at 5; *see also* ECF No. 8 at 3-4.

The Court finds that it does have jurisdiction to consider Mr. Luis' claim. Additionally, for the reasons stated below, the Court GRANTS Mr. Luis' Amended Petition and ORDERS the Government to immediately release him under reasonable conditions of supervision.

## I.    BACKGROUND

### A.    Statutory and Regulatory Framework

Under 8 U.S.C. § 1226, the Government may detain certain noncitizens "already in the country" during the pendency of their removal proceedings. *Jennings v. Rodriguez*, 583 U.S. 281, 289 (2018). Unless ineligible for release under 8 U.S.C. § 1226(c),[4] an ICE officer "makes the initial determination" as to whether to detain a noncitizen under 8 U.S.C. § 1226(a) ("Section 1226(a)"). *Hernandez-Lara v. Lyons*, 10 F.4th 19, 41 (1st Cir. 2021) (citing 8 C.F.R. § 236.1(c)(8)). Section 1226(a) is often

---

[4] This provision of the Immigration and Nationality Act ("INA") mandates the detention of noncitizens who have been convicted of specified crimes. *See Hernandez-Lara v. Lyons*, 10 F.4th 19, 35 (1st Cir. 2021). This provision does not apply to Mr. Luis because he has not been convicted of a crime.

called the "discretionary detention statute" because it permits—but does not require—the Government to arrest and detain a noncitizen "[o]n a warrant issued by the Attorney General," or their designees, "pending a decision on whether the [noncitizen] is to be removed from the United States." *Guerrero Orellana v. Moniz*, 802 F. Supp. 3d 297, 304 (D. Mass. 2025).

If the ICE officer opts for continued detention, then the noncitizen has a Fifth Amendment Due Process right to seek review of that decision at a bond hearing (also known as a "custody redetermination hearing") before an immigration judge ("IJ"). *See Hernandez-Lara*, 10 F.4th at 41. At that hearing, the Government bears the burden of proving either: (1) "by clear and convincing evidence that [the noncitizen] poses a danger to the community" or (2) "by a preponderance of the evidence that [the noncitizen] poses a flight risk." *Id.* If the Government fails to meet this burden, then bond or conditional parole must be granted. *See, e.g.*, *Gomes v. Hyde*, 804 F. Supp. 3d 265, 268-70 (D. Mass. 2025); *Bermeo Sicha v. Bernal*, No. 1:25-cv-00418-SDN, 2025 WL 2494530, at *4 (D. Me. Aug. 29, 2025). If, however, the Government does meet its burden and the IJ determines that the noncitizen must remain in custody, then the noncitizen may further appeal that decision to the Board of Immigration Appeals ("BIA"), which is the body charged with reviewing the decisions of IJs. *See Hernandez-Lara*, 10 F.4th at 26 (citing 8 C.F.R. § 236.1(d)(3)).

B.    Factual and Procedural Background

Mr. Luis is a twenty-year-old citizen of Guatemala. ECF No. 13-1 at 2; ECF No. 13-4 at 13. After entering the United States in January 2023, he was granted

3

Special Immigrant Juvenile ("SIJ") status[5] by U.S. Citizenship and Immigration Services ("USCIS"), and he also obtained SIJ-based deferred action[6] and employment authorization (i.e., a "work permit"). ECF No. 13-1 at 2. He now lives and works in Massachusetts. *See* ECF No. 13-2.

On February 3, 2026, two New Bedford, Massachusetts police officers were dispatched to a residence to meet with a seventeen-year-old woman (the "Complainant")[7] who reported that her ex-boyfriend had come over and assaulted her and damaged her property. ECF No. 13-4 at 15. The Complainant identified her ex-

---

[5] SIJ status is a "'protective classification designed by Congress to safeguard abused, abandoned, or neglected alien children who are able to meet its rigorous eligibility requirements.'" *Cosme v. Garland*, 619 F. Supp. 3d 264, 266 (D.R.I. 2022) (quoting *Osorio-Martinez v. Att'y Gen. United States of Am.*, 893 F.3d 153, 158 (3d Cir. 2018)); *see* 8 U.S.C. §§ 1101(a)(27)(J), 1154(a)(1)(G). Those with SIJ status are eligible to seek adjustment of status to that of a lawful permanent resident, which is often referred to as a "green card." *See Cosme*, 619 F. Supp. 3d at 266.

[6] Until 2025, USCIS had a policy of granting "deferred action" to those with SIJ status who had filed for adjustment of status but were waiting for immigrant visas to become available to them, as the adjustment of status statute requires. *See Primero v. Mattivelo*, No. 1:25-cv-11442-IT, 2025 WL 1899115, at *2 (D. Mass. July 9, 2025) (citing USCIS, Policy Alert PA-2022-10 (Mar. 7, 2022), https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20220307-SIJAndDeferredAction.pdf [https://perma.cc/LA4C-ARZ9]); *see also* 8 U.S.C. § 1255(a). "Deferred action 'is an act of administrative convenience to the government which gives some cases lower priority for removal from the United States for a specific period of time.'" *Id.* (citing USCIS, Policy Manual, vol. 6, pt. J., ch. 4 ¶ G.2). A grant of deferred action also provided an SIJ with the opportunity to apply for a work permit. *See* USCIS, Policy Alert PA-2022-10 (citing 8 C.F.R. 274a.12(c)(14)).

In 2025, USCIS revoked its SIJ Deferred Action policy but has stated that noncitizens "with current deferred action based on their SIJ classification will generally retain this deferred action, as well as retain their current employment authorization provided based on this deferred action, until the current validity periods expire." *Primero*, 2025 WL 1899115, at *2 (quoting USCIS, Policy Alert PA-2025-07 (June 6, 2025), https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20250606-SIJDeferredAction.pdf [https://perma.cc/M9Y4-NBC9]).

[7] To protect her privacy, the Court will refer to her only as "the Complainant."

4

boyfriend as Mr. Luis. *Id.* She stated to the police that when Mr. Luis came into her bedroom, she told him that she no longer wanted to be with him. *Id.* The Complainant said that Mr. Luis then demanded that she return the cellphone he had previously bought for her. *Id.* She stated that she agreed to give the cellphone back but wanted to clear her data of it first. *Id.* In the process, the Complainant said that the cellphone fell out of her hands and slid under the bed. *Id.*

At this point, the Complainant stated that Mr. Luis pushed her to the floor, got on top of her, grabbed her by the arms, and covered her mouth so that no one else in the house would hear them. *Id.* The Complainant showed the police her right arm, which the officers noted had "bruising near her armpit." *Id.* The Complainant's younger sister also told the police that she walked into the bedroom and saw Mr. Luis on top of her sister but thought that he was tickling her. *Id.* The Complainant stated that she pushed Mr. Luis to get him away from her and that he later left the house with her cellphone. *Id.* at 15, 18. The police took down the Complainant's information and left shortly thereafter.

Later that evening, New Bedford police officers returned to the Complainant's residence after she reported that Mr. Luis had been sending her parents harassing messages. *Id.* at 18. The Complainant's parents told the police that Mr. Luis had sent them a video of him scrolling through text messages on the Complainant's phone that contained nude photos of the Complainant. *Id.* The Complainant's parents showed this video to the police. *Id.*

5

Police officers arrested Mr. Luis that night and charged him with assault and battery on a household member and, as the Complainant was only seventeen, distribution and possession of child pornography. *Id.* at 16-17, 20. He was arraigned on the assault and battery charge the next day in New Bedford District Court. *Id.* at 6. Following the arraignment, ICE officers arrested Mr. Luis at the courthouse and charged him with being removable under 8 U.S.C. § 1182(a)(6)(A)(i)[8] and 8 U.S.C. § 1182(a)(7)(A)(i)(I).[9] *Id.* at 5. In addition, USCIS later informed Mr. Luis that it was exercising its discretion in terminating his SIJ-based deferred action and work permit.[10] *Id.* at 10.

Since he was first detained on February 4, 2026, ICE has repeatedly transferred Mr. Luis to different detention facilities across the country, "including transfers from Massachusetts to Rhode Island, then to Louisiana, then to Ohio, and ultimately back to Rhode Island." ECF No. 15 at 2. He is currently being held at the Wyatt in Central Falls, Rhode Island. *Id.*

Mr. Luis has twice requested bond hearings before IJs, seeking to challenge his detention. *Id.* At his first bond hearing held on February 17, 2026, the IJ found that the Government "did not demonstrate that [Mr. Luis] was a danger to the

---

[8] This provision of the INA renders a noncitizen removable if they are "present in the United States without being admitted or paroled." *López-Pérez v. Garland*, 26 F.4th 104, 109 (1st Cir. 2022) (quoting 8 U.S.C. § 1182(a)(6)(A)(i)).

[9] This provision of the INA renders a noncitizen removable if they are "not in possession of a valid entry document." *Gonzalez-Arevalo v. Garland*, 112 F.4th 1, 6 (1st Cir. 2024) (citing 8 U.S.C. § 1182(a)(7)(A)(i)(I)).

[10] As relevant here, "USCIS reserves the right to terminate grants of deferred action to SIJs 'as a matter of discretion.'" *Primero*, 2025 WL 1899115, at *2 (quoting USCIS, Policy Manual, vol. 6, pt. J., ch. 4 ¶ G.2).

6

community by clear and convincing evidence." ECF No. 13-10 at 2 (displaying first IJ's memorandum of decision). The IJ did, however, find that the Government had met its burden of proving that Mr. Luis "posed the risk of flight and no amount of bond would ameliorate that risk." *Id.* Following this hearing, Judge Julia E. Kobick of the U.S. District Court for the District of Massachusetts ordered the Government to provide Mr. Luis with a new, "constitutionally adequate bond hearing." ECF No. 13-11 at 4.

At the second bond hearing held on March 11, 2026, a second IJ found Mr. Luis to pose a flight risk. ECF No. 13-18 at 7 (displaying second IJ's memorandum of decision). The IJ primarily relied on the evidence of criminal activity presented against Mr. Luis, as well as USCIS's termination of his SIJ-based deferred action and work permit. *Id.*; *see also* Bond Hearing, at 52:12-53:20, Chelmsford Immigr. Ct. (recorded Mar. 11, 2026) (hereinafter "Bond Hearing").[11] Based on the evidence before her, the IJ concluded that the Government had met its burden of proving flight risk by a preponderance of the evidence and, as such, she denied Mr. Luis' renewed request for release on bond. ECF No. 13-18 at 7.

Mr. Luis filed the present Petition a few weeks later, which he has since amended. *See* ECF No. 15. Along with the Amended Petition, Mr. Luis has told the Court that the criminal charges against him have now been either dismissed or dropped. *See* ECF No. 6 at 1-2; *see also* ECF No. 4 at 4 (showing that the New

---

[11] The Government submitted an audio recording of the bond hearing. *See* ECF No. 13-16. The Court has listened to the bond hearing in its entirety and quotes relevant portions from it throughout this Order.

Bedford District Court dismissed Mr. Luis' assault and battery charge upon failure to prosecute); ECF No. 13-18 at 3 (indicating that a New Bedford police detective "request[ed] [Mr. Luis'] case be closed as [the Complainant] does not wish to move forward with a criminal investigation"). He argues that, under the present circumstances, his continued detention is no longer justified and "raises serious constitutional concerns under the Due Process Clause." ECF No. 15 at 4. The Government opposes Mr. Luis' request for release from ICE custody. *See* ECF Nos. 8, 10, 16.

## II. DISCUSSION

### A. Jurisdiction

#### 1. Section 1226(e)

At the outset, the Government presents a familiar argument, asserting that 8 U.S.C. § 1226(e) deprives this Court of jurisdiction to review Mr. Luis' Amended Habeas Petition. ECF No. 10 at 4. This provision of the INA provides that "[t]he [Secretary of Homeland Security's][12] discretionary judgment regarding the application of this section shall not be subject to review," and that "[n]o court may set aside any action or decision by the [Secretary] under this section regarding the detention of any [noncitizen] or the revocation or denial of bond or parole." 8 U.S.C.

---

[12] The language of the statute refers to the "Attorney General's discretionary judgment." 8 U.S.C. § 1226(e). However, following the lead of the Supreme Court, the Court has replaced the Attorney General with the Secretary of Homeland Security because "Congress has empowered the Secretary to enforce the [INA]." *Nielsen v. Preap*, 586 U.S. 392, 397 n.2 (2019) (citing 8 U.S.C. § 1101 et seq.); *see also id.* at 401 (replacing "Attorney General" with "Secretary" for the purposes of Section 1226(e)).

§ 1226(e).  As it has in previous cases, the Government insists that Section 1226(e) precludes the Court from reviewing the IJ's decision to detain Mr. Luis without bond. ECF No. 10 at 4.  It does not.

As the Court has stated many times before, Section 1226(e) does not deprive it of jurisdiction over "constitutional claims or questions of law."  *See, e.g.*, *Garcia v. Hyde*, 817 F. Supp. 3d 112, 124 (D.R.I. 2025); *Mavungo-Raymond v. Nessinger*, No. 26-cv-013-JJM-AEM, 2026 WL 161358, at *8 (D.R.I. Jan. 21, 2026); *Picado v. Hyde*, No. 26-cv-065-JJM-PAS, 2026 WL 352691, at *4-5 (D.R.I. Feb. 9, 2026); *España v. Nessinger*, No. 26-cv-014-JJM-PAS, --- F. Supp. 3d ----, 2026 WL 821788, at *4-6 (D.R.I. Mar. 25, 2026); *Higiro v. Nessinger*, No. 26-cv-105-JJM-AEM, 2026 WL 1329522, at *2 n.4 (D.R.I. May 13, 2026); *Soares De Souza v. Nessinger*, No. 26-cv-221-JJM-PAS, 2026 WL 1593406, at *3 (D.R.I. June 4, 2026).

Indeed, "where a 'bond denial is challenged as legally erroneous or unconstitutional,' a district court sitting in habeas retains jurisdiction over that challenge."  *España*, 2026 WL 821788, at *5 (quoting *Mayancela Mayancela v. FCI Berlin, Warden*, No. 25-cv-348-LM-TSM, 2025 WL 3215638, at *6 (D.N.H. Nov. 18, 2025)).  That is the sort of challenge that Mr. Luis brings here, arguing that ICE's decision to keep him in custody "raises serious constitutional concerns under the Due Process Clause."  ECF No. 15 at 4.

As such, Section 1226(e) does not deprive the Court of jurisdiction over Mr. Luis' claim.

## 2.   Section 1252(a)(2)(B)(ii)

The Government also argues that 8 U.S.C. § 1252(a)(2)(B)(ii) bars judicial review over Mr. Luis' claim. ECF No. 5 at 9-11. That provision of the INA states that "no court shall have jurisdiction to review . . . any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under [8 U.S.C. §§ 1151-1378] to be in the discretion of the Attorney General or the Secretary of Homeland Security . . . ." 8 U.S.C. § 1252(a)(2)(B)(ii).

As numerous courts have recognized, Section 1252(a)(2)(B)(ii), like Section 1226(e), "'does not limit habeas jurisdiction over questions of law'" or "constitutional claims." *Hernandez v. Sessions*, 872 F.3d 976, 988 (9th Cir. 2017) (quoting *Singh v. Holder*, 638 F.3d 1196, 1202 (9th Cir. 2011)); *see also Hernandez v. Mullin*, No. 5:26 CV-00585-JAK, 2026 WL 846037, at *4 (C.D. Cal. Mar. 24, 2026) (collecting cases). Again, Mr. Luis challenges his continued detention under the Due Process Clause, and Section 1252(a)(2)(B)(ii) does not preclude the Court from reviewing that challenge.

## B.   Exhaustion

The Government also argues that Mr. Luis should be required to exhaust his administrative remedies before pursuing habeas relief in this Court. ECF No. 8 at 3-4; ECF No. 10 at 3. Specifically, the Government contends that Mr. Luis must first appeal the IJ's denial of his request for release on bond to the BIA. ECF No. 8 at 4. As a matter of fact, Mr. Luis *has* appealed both of his denials of bond to the BIA. *See* ECF No. 15 at 3 ("[Mr. Luis] presently has two bond-related appeals pending before

10

the [BIA]."). The Court will analyze the Government's exhaustion argument just to be thorough.

"There are two species of exhaustion: statutory and common-law." *Brito v. Garland*, 22 F.4th 240, 255 (1st Cir. 2021). Statutory exhaustion deprives a federal court of jurisdiction, whereas common-law exhaustion "cedes discretion to a [federal] court to decline the exercise of jurisdiction." *Id.* (quoting *Anversa v. Partners Healthcare Sys., Inc.*, 835 F.3d 167, 174 (1st Cir. 2016)). Here, no statute requires exhaustion. *See Garcia*, 817 F. Supp. 3d at 125.

This case is instead governed by the "more permissive" common-law exhaustion standard. *Brito*, 22 F.4th at 256. Under this standard, the Court may find exhaustion to be unnecessary where "'a particular plaintiff may suffer irreparable harm if unable to secure immediate judicial consideration of his claim.'" *Portela-Gonzalez v. Sec'y of the Navy*, 109 F.3d 74, 77 (1st Cir. 1997) (quoting *McCarthy v. Madigan*, 503 U.S. 140, 147 (1992)). Alternatively, the Court may find exhaustion unnecessary "if a substantial doubt exists about whether the agency is empowered to grant meaningful redress." *Id.* (citing *McCarthy*, 503 U.S. at 147-48).

As to irreparable harm, "this Court has found repeatedly [that] the loss of liberty endured by a noncitizen in ICE custody is a 'severe form of irreparable injury.'" *España*, 2026 WL 821788, at *8 (quoting *Garcia*, 817 F. Supp. 3d at 125); *see also Brito*, 22 F.4th at 256 (suggesting that exhaustion might not be required in immigration detention cases if the petitioner "remains detained at present"); *Bois v. Marsh*, 801 F.2d 462, 468 (D.C. Cir. 1986) ("[E]xhaustion might not be required if [the

11

petitioner] were challenging her incarceration . . . or the ongoing deprivation of some other liberty interest.").

Here, Mr. Luis has been in ICE detention for over four months and counting, and he challenges ICE's ongoing deprivation of his liberty. Indeed, as an individual detained under Section 1226(a), the exact length of Mr. Luis' detention "is impossible to predict" and will likely be "quite lengthy." *Hernandez-Lara*, 10 F.4th at 29. And, as mentioned, he has filed two bond-related appeals with the BIA. *See* ECF No. 15 at 3. This is pertinent because "[a]ccording to data released by the Executive Office for Immigration Review, the average processing time for bond appeals exceeded 200 days in 2024." *Gomes*, 804 F. Supp. 3d at 272 (citing *Rodriguez v. Bostock*, 779 F. Supp. 3d 1239, 1248-49 (W.D. Wash. 2025)).

Assuming the BIA is processing appeals at the same rate as 2024, Mr. Luis would likely face several additional months, if not years, of detention while he awaits decisions on his bond appeals. *See Hechavarria v. Whitaker*, 358 F. Supp. 3d 227, 240 (W.D.N.Y. 2019) (waiving exhaustion requirement where "delays inherent in the [BIA review] process . . . would result in the very harm that the bond hearing was designed to prevent: prolonged detention without due process during lengthy and backlogged removal proceedings") (internal quotations and citations omitted).

Furthermore, Mr. Luis "ultimately raises a constitutional challenge in his habeas petition, which is an area over which the Immigration Court and the BIA lack any authority to adjudicate, thereby rendering appeal to those bodies futile." *Garcia*, 817 F. Supp. 3d at 125; *see also Matter of Cruz de Ortiz*, 25 I&N Dec. 601, 605 (BIA

12

2011) ("[N]either we nor the [IJs] have authority to rule on the constitutionality of the statutes we administer."); *see also Padilla-Padilla v. Gonzales*, 463 F.3d 972, 977 (9th Cir. 2006) ("Because the BIA could not have addressed the [petitioners'] constitutional due process claim, the [petitioners] were not required to exhaust the issue before the BIA.").

Accordingly, any exhaustion requirement is hereby waived, and the Court will now proceed to the merits of Mr. Luis' claim.

## C.   The Merits

In his Amended Habeas Petition,  Mr. Luis argues that his continued detention violates the Due Process Clause of the Fifth Amendment.  *See* ECF No. 15 at 4.  In an earlier notice, he told the Court that the Massachusetts criminal charges that led to his detention in the first place have now been either dismissed or dropped.  *See* ECF No. 6 at 1-2.  "Continued detention under these circumstances," Mr. Luis asserts, "no longer bears a reasonable relation to any legitimate governmental purpose and raises serious constitutional concerns under the Due Process Clause." ECF No. 15 at 4.

To begin, the Fifth Amendment's Due Process Clause provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.  "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).  This right to liberty extends to all individuals in the United States, regardless of

13

citizenship status. *Id.* at 693 ("[T]he Due Process Clause applies to all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent."); *see also Reno v. Flores*, 507 U.S. 292, 306 (1993) ("It is well established that the Fifth Amendment entitles [noncitizens] to due process of law in deportation proceedings.").

The Supreme Court "has recognized detention during deportation proceedings as a constitutionally valid aspect of the deportation process." *Demore v. Kim*, 538 U.S. 510, 523 (2003). However, unlike imprisonment in the criminal context, civil immigration detention is "nonpunitive in purpose and effect." *Zadvydas*, 533 U.S. at 690. Indeed, the Supreme Court has made clear that only two governmental interests are legitimately advanced by detention in the immigration context: (1) "ensuring the appearance of [noncitizens] at future immigration proceedings"; and (2) "preventing danger to the community." *Id.* (cleaned up); *see also Matter of Guerra*, 24 I&N Dec. 37, 40 (BIA 2006) (explaining that, when determining whether to release a noncitizen from detention, IJs are to consider whether the individual "is a threat to national security, a danger to the community at large, likely to abscond, or otherwise a poor bail risk"). Thus, a noncitizen's detention must bear a "reasonable relation" to one of these two interests. *Id.* (quoting *Jackson v. Indiana*, 406 U.S. 715, 738 (1972)).

That said, "for detention to *remain* reasonable," greater justification is needed "as the period of . . . confinement grows." *Zadvydas*, 533 U.S. at 701 (emphasis added); *see also Velasco Lopez v. Decker*, 978 F.3d 842, 853 (2d Cir. 2020) ("'[A]s the period of . . . confinement grows,' so do the required procedural protections no matter

14

what level of due process may have been sufficient at the moment of initial detention."). "[S]ince the Due Process Clause prohibits arbitrary deprivations of liberty," a court may need to conduct a more searching inquiry into the justifications underlying a noncitizen's detention "if the continued detention [becomes] unreasonable or unjustified." *Demore*, 538 U.S. at 532, (Kennedy, J., concurring).

When considering whether a noncitizen's continued detention is justified, courts routinely apply the three-part balancing test articulated in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *See Velasco Lopez*, 978 F.3d at 851 (analyzing procedural due process challenge to prolonged detention of noncitizen held pursuant to Section 1226(a) using *Mathews* test); *Rodriguez Diaz v. Garland*, 53 F.4th 1189, (9th Cir. 2022) (same); *cf. Hernandez-Lara*, 10 F.4th at 27-28 (applying *Mathews* test, not to Section 1226(a) detainee's prolonged detention argument, but instead to her challenge to the allocation of the burden of proof at bond hearings).

The *Mathews* test considers: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335. The Court weighs each factor in reviewing Mr. Luis' challenge to his continued detention.

### 1.    Mr. Luis' Private Interest

As to the first *Mathews* factor, there is no question that Mr. Luis' private interest is strong.  He is asserting "the most elemental of liberty interests—the interest in being free from physical detention by [the] government."  *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004).  As the Supreme Court has recognized time and again, "'[i]n our society liberty is the norm,' and detention . . . 'is the carefully limited exception.'"  *Id.* (quoting *United States v. Salerno*, 481 U.S. 739, 755 (1987)).  That is why courts should be "careful not to 'minimize the importance and fundamental nature' of the individual's right to liberty.'"  *Id.* at 529-30 (quoting *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)).  In the same vein, "'commitment for *any* purpose constitutes a significant deprivation of liberty that requires due process protection.'"  *Id.* at 530 (emphasis in original) (quoting *Jones v. United States*, 463 U.S. 354, 361 (1983)).

The First Circuit has had the opportunity to weigh the private interests of those individuals who, like Mr. Luis, are detained by ICE under Section 1226(a).  *See Hernandez-Lara*, 10 F.4th at 29.  As that court put it, "removal proceedings have an end point and . . . the liberty interest of a noncitizen detained under [S]ection 1226(a) may therefore be slightly less weighty than that of individuals facing indefinite and prolonged detention."  *Id.*  But that interest is "only slightly less" weighty because "[t]he exact length of detention under [S]ection 1226(a) is impossible to predict and can be quite lengthy."  *Id.*  Indeed, "[d]etention under [Section] 1226(a) is frequently prolonged because it continues until all proceedings and appeals are concluded."

16

*Velasco Lopez*, 978 F.3d at 852. "Absent release on bond, detention lasts through the initial removal determination proceedings (which themselves can take months or years) and all inter-agency and federal court appeals, even where an individual has prevailed and the Government appeals." *Id.*

Since he was arrested by ICE at the beginning of February 2026, Mr. Luis has spent over four months in immigration detention. *See* ECF No. 15 at 2. There is no bright-line rule that provides the length of time that a noncitizen must spend in ICE custody before they may challenge their continued detention as unjustified. In *Zadvydas*, the Supreme Court opined that the detention of noncitizens who are subject to final orders of removal under 8 U.S.C. § 1231(a) ("Section 1231(a)") is "presumptively reasonable" for up to six months. 533 U.S. at 701. There are, however, several key distinctions between that case and this one.

First and foremost, Mr. Luis—unlike the petitioner in *Zadvydas*—is not subject to a final order of removal, and his detention is governed by Section 1226(a) (a discretionary detention statute) as opposed to Section 1231(a) (a mandatory detention statute). *See* 8 U.S.C. § 1231(a)(2) (requiring the detention of noncitizens who are subject to final orders of removal for at least ninety days).

Second, even if the Court were to be guided by *Zadvydas*, "a *presumption* of reasonableness . . . is just that: a default, a starting point." *Cruz Medina v. Noem*, 794 F. Supp. 3d 365, 374 (D. Md. 2025) (emphasis in original). "Both during the six-month period and after, a district court has an ongoing 'obligation to determine whether detention remains authorized.'" *Douglas v. Baker*, 812 F. Supp. 3d 525, 529

17

(D. Md. 2025) (quoting *Cruz Medina*, 794 F. Supp. 3d at 372); *see also Phommachak v. Wesling*, 816 F. Supp. 3d 201, 210 (D. Mass. 2026).

Third, in this case, there is a chance that Mr. Luis has spent more than six *cumulative* months in immigration detention.  According to his Form I-213,[13] Mr. Luis also spent time in ICE custody upon his arrival to the United States in 2023. *See* ECF No. 13-4 at 6 ("On January 17, 2023, [Mr. Luis] entered without inspection (EWI) at the Paso Del Norte Bridge in El Paso, Texas.  [Mr. Luis] was arrested by the United States Border Patrol (USBP) and served Form I-862, Notice to Appear."). While the exact length of his initial detention is unspecified, it is relevant to this Court's analysis that ICE has deprived Mr. Luis of his liberty interest not once but twice.  *See Morrissey v. Brewer*, 408 U.S. 471, 482 (1972) (recognizing that individuals have a liberty interest in their continued freedom after they are released from prison on parole); *Avila Zaldivar v. De Anda-Ybarra*, No. 1:26-cv-01210-KG-DLM, 2026 WL 1707595, at *5 (D.N.M. June 12, 2026) (recognizing that the liberty interest of a noncitizen who was free from ICE custody for two years before being redetained grew stronger as he worked and lived within his community); *Pinchi v. Noem*, 792 F. Supp. 3d 1025, 1032 (N.D. Cal. 2025) ("[E]ven when ICE has the initial discretion to detain or release a noncitizen pending removal proceedings, after that

---

[13] A Form I-213 is essentially a police report created by a DHS officer, which lists biographical and factual information about the noncitizen. *See España*, 2026 WL 821788, at *11 (citing *Garcia-Aguilar v. Lynch*, 806 F.3d 671, 673 (1st Cir. 2015); *Jianli Chen v. Holder*, 703 F.3d 17, 23 n.4 (1st Cir. 2012)). The form "may refer to criminal charges that a noncitizen is alleged to have committed, but it is not evidence of those criminal charges themselves." *Id.*

individual is released from custody she has a protected liberty interest in remaining out of custody.").

Another relevant consideration is that Mr. Luis' liberty deprivation is "not the result of a criminal adjudication." *Velasco Lopez*, 978 F.3d at 851; *see also Hernandez-Lara*, 10 F.4th at 36 ("Unlike [S]ection 1226(c), [S]ection 1226(a) applies to a wide swath of noncitizens, many of whom . . . have no criminal record at all."). Indeed, as Mr. Luis points out, any criminal charges against him have now been either dismissed or dropped. *See* ECF No. 6 at 1-2. Nevertheless, "he finds himself confined alongside criminal offenders, even though he himself has not been convicted of a criminal offense—a finding that causes the first *Mathews* factor to weigh heavily in his favor." *Cruz v. Bondi*, No. 25-cv-262-JJM-PAS, 2025 WL 3295485, at *8 (D.R.I. Nov. 26, 2025) (citing *Hernandez-Lara*, 10 F.4th at 28; *Sampiao v. Hyde*, 799 F. Supp. 3d 14, 31 (D. Mass. 2025)).

For these reasons, the first prong of the *Mathews* test weighs in favor of Mr. Luis.

### 2. The Risk of Erroneous Deprivation

The Court next considers the risk of an erroneous deprivation of Mr. Luis' liberty interest, and the degree to which alternative procedures may ameliorate that risk. *See Mathews*, 424 U.S. at 335. At this stage in the *Mathews* calculus, the primary interest is that of the detained individual—not the Government. *See Hamdi*, 542 U.S. at 530 (citing *Carey v. Piphus*, 435 U.S. 247, 259, 266 (1978)).

19

At first glance, this factor appears to favor the Government.  Mr. Luis has received two bond hearings at which the Government had the burden of proving that he posed a danger to the community by clear and convincing evidence or that he posed a flight risk by a preponderance of the evidence.[14]  At both hearings, IJs found him to pose a flight risk.  Mr. Luis has since appealed both orders to the BIA, presumably on the basis that the state criminal charges that led to his detention in the first place have now been either dismissed or dropped.  *See* ECF No. 6 at 1-2.

However, right around the time of Mr. Luis' first appeal, the Government introduced sweeping changes to the procedures governing appeals to the BIA.  On February 6, 2026, the Executive Office for Immigration Review ("EOIR"), a component of the Department of Justice, issued an interim final rule ("IFR") aimed at "streamlin[ing] administrative appellate review by the [BIA]."  Appellate Procedures for the Board of Immigration Appeals, 91 Fed. Reg. 5267, 5267 (Feb. 6, 2026) [hereinafter BIA Appellate Procedures].  First, the IFR mandated the summary dismissal of every appeal filed by an individual seeking appellate review of an adverse IJ decision, unless a majority of the BIA, sitting en banc, voted to review the case on the merits within ten days of receiving the Notice of Appeal.  *Id.* at 5270-71.  Second,

---

[14] Notably, Mr. Luis did not receive these hearings right away.  When he was first detained, the Government argued that he was detained under 8 U.S.C. § 1225(b) and thus statutorily ineligible for a bond hearing.  *See* ECF No. 13-1 at 2.  Mr. Luis then filed a habeas petition in federal court, and Judge Kobick recognized that he was subject to Section 1226(a) and ordered that the Government provide him with a bond hearing.  *Id.*  After the Government failed to provide him with a "constitutionally adequate" hearing, Mr. Luis filed a motion to enforce and Judge Kobick ordered a second bond hearing.  *See* ECF No. 13-11 at 3-4.

the IFR vastly shortened the deadline for filing an appeal with the BIA from thirty days to ten days, except for cases involving certain asylum applications. *Id.* at 5272.

On March 8, 2026, one day before the IFR was set to take effect, Judge Randolph D. Moss of the U.S. District Court for the District of Columbia vacated the rule after finding that the Government had failed to comply with the notice-and-comment rulemaking procedures outlined in the Administrative Procedure Act ("APA"). *See Amica Ctr. for Immigr. Rts. v. Exec. Off. for Immigr. Rev.*, 822 F. Supp. 3d 119, 128 (D.D.C. 2026), *appeal docketed*, No. 26-5156 (D.C. Cir. May 11, 2026). Judge Moss remanded the matter to EOIR and, though the Government has appealed this decision to the D.C. Circuit, EOIR is engaged in notice-and-comment rulemaking to address the portions of the IFR that were vacated by the court. *Id.*; *see also* Minute Order, *Amica Ctr. for Immigr. Rts. v. Exec. Off. for Immigr. Rev.*, No. 26-cv-696-RDM (D.D.C. Apr. 10, 2026) ("In light of the Stipulation to Stay Pending Final Rule . . ., it is hereby ORDERED that this case and all pending deadlines are STAYED pending the completion of the notice-and-comment period and promulgation of the Final Rule.").

It is unclear what effect these legal developments will have on Mr. Luis' pending appeals before the BIA. His first bond hearing occurred on February 17, 2026, which is eleven days after the IFR was first announced. *See* ECF No. 13-10. His second bond hearing took place on March 11, 2026, a mere three days after the IFR was vacated and remanded. *See* ECF No. 13-18. On the one hand, if the IFR is resuscitated, then Mr. Luis' appeals may never be heard if a majority of the BIA

21

decides that they do not "present novel issues warranting the Board's attention." BIA Appellate Procedures, 91 Fed. Reg. at 5270. On the other hand, if the IFR remains vacated, then—by the BIA's own admission—Mr. Luis might have to wait "years" for "the Board to focus its limited resources on adjudicating the more than 200,000 pending appeals" before it. *Id.*

All told, under the Government's self-proposed procedures, a reviewing body may never get the chance to consider the evidence of Mr. Luis' dismissed charges. This substantially increases the risk that Mr. Luis will be erroneously deprived of his interest in his liberty. *See Mathews*, 424 U.S. at 335. As Mr. Luis correctly points out, "[a]bsent adjudication of [his] appeals, [he] is effectively unable to obtain meaningful review of his custody determination in any other forum." ECF No. 15 at 3.

In addition, the risk of erroneous deprivation further increases "where the [G]overnment has been . . . chang[ing] the rules by fiat," *Alvarez Ortiz v. Freden*, 808 F. Supp. 3d 579, 600 (W.D.N.Y. 2025), and "pull[ing] the rug out from under [noncitizens] who tried to do things the right way." *Mata Velasquez v. Kurzdorfer*, 794 F. Supp. 3d 128, 154 (W.D.N.Y. 2025)). Both of these circumstances happen to be present here, thereby requiring this Court's intervention.

As such, the second *Mathews* prong also weighs in Mr. Luis' favor.

### 3.    The Government's Interest

Finally, the Court considers "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute

22

procedural requirement would entail." *Mathews*, 424 U.S. at 335. As mentioned, the Government has legitimate interests in ensuring that noncitizens do not pose a danger to the community or present a flight risk. *See Zadvydas*, 533 U.S. at 690; *Matter of Guerra*, 24 I&N Dec. at 40.

In this case, the Government argued that Mr. Luis posed both a danger to the community and a flight risk based on two grounds: (1) the evidence of criminal activity presented against Mr. Luis stemming from his state court criminal charges; and (2) the termination of Mr. Luis' SIJ-based deferred action and work permit. *See* ECF No. 13-18 at 5-7; *see also* Bond Hearing, at 52:12-53:20. Mr. Luis was found not to pose a danger to the community. *See* ECF No. 13-10 at 2 ("At the conclusion of the bond hearing, the [Immigration Court] determined that . . . DHS did not demonstrate that [Mr. Luis] was a danger to the community by clear and convincing evidence[.]").[15] He was found, however, to pose a flight risk, and his request for release on bond was therefore denied. *Id.*; *see also* ECF No. 13-18 at 7.

Generally speaking, "[a]bsent any legal or constitutional error in the IJ's analysis, the Court must let the IJ's decision stand." *Soares De Souza*, 2026 WL 1593406, at *8. This is so because the First Circuit instructs courts to be "mindful of [their] obligation to afford . . . a degree of deference to the [factfinder's] determinations." *United States v. Tortora*, 922 F.2d 880, 882 (1st Cir. 1990) (citing *United States v. O'Brien*, 895 F.2d 810, 814 (1st Cir. 1990)).

---

[15] The IJ that conducted Mr. Luis' second bond hearing "would have found [Mr. Luis] to be a danger to the community by clear and convincing evidence," but she ultimately chose to let the first IJ's ruling on that issue stand. ECF No. 13-18.

At the same time, the Supreme Court has made clear that if the basis for civil commitment no longer exists, then continued detention loses its constitutional footing. *See O'Connor v. Donaldson*, 422 U.S. 563, 575 (1975) (holding as a matter of due process that, even if a State's initial commitment of an individual was permissible, "it could not constitutionally continue after that basis no longer existed"); *Jones*, 463 U.S. at 368 ("The committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous."); *Foucha*, 504 U.S. at 78 ("[T]he basis for holding [petitioner] in a psychiatric facility as an insanity acquittee has disappeared, and the State is no longer entitled to hold him on that basis.").

This principle has been recognized in the immigration context as well. In *Zadvydas*, the Supreme Court indicated that the Government's interest in detaining those noncitizens who it believes to pose a "flight risk" may "evaporate[ ]" or become "weak or nonexistent where removal seems a remote possibility at best." 533 U.S. at 690, 691. In other words, the Government's interest is not static. Detention that was once lawful can later become unlawful where the goal of detention "is no longer practically attainable" and the detention itself "no longer 'bear[s] [a] reasonable relation to the purpose for which the individual [was] committed.'" *Zadvydas*, 533 U.S. at 690 (quoting *Jackson v. Indiana*, 406 U.S. 715, 738 (1972)).

As relevant here, the Government's interest in detaining Mr. Luis as a flight risk seems to have "evaporate[d]" and become "weak or nonexistent." *Id.* at 690, 691. As of this writing, there are no longer any active criminal charges lodged against Mr. Luis. A Massachusetts state court has dismissed the assault and battery charge. *See*

24

ECF No. 4 at 4.  In addition, the New Bedford Police Department has indicated that it will not be pursuing the child pornography charges.  *See* ECF No. 13-18 at 3.

Of course, that criminal charges have been dismissed or dropped does not automatically cancel out their evidentiary value for the purposes of a bond hearing. *See, e.g.*, *Miti v. Moniz*, No. 26-11327-BEM, --- F. Supp. 3d ----, 2026 WL 884639, at *6 (D. Mass. Mar. 31, 2026) ("The mere fact that the assault charge against Petitioner was dismissed does not automatically cancel out its evidentiary value.").  As the BIA makes clear, evidence of criminal activity is highly relevant to the analysis of dangerousness to the community.  *See Matter of Guerra*, 24 I&N Dec. 37, 40 (BIA 2006), *abrogated on other grounds*, *Hernandez-Lara*, 10 F.4th at 41.[16]  The BIA instructs that IJs "are not limited to considering *only* criminal convictions in assessing whether [a noncitizen] is a danger to the community."  *Id.* (emphasis in original).  The IJ is permitted to consider "[a]ny evidence in the record that is probative and specific," including "evidence of criminal activity," which "is pertinent to the [IJ's] analysis regarding whether the [noncitizen] poses a danger to the community."  *Id.* at 40-41.

By contrast, dismissed criminal charges are not as relevant to the flight risk analysis.  To be sure, one could see how someone with criminal convictions or pending

---

[16] "The First Circuit has since abrogated *Matter of Guerra* to the extent that noncitizen detainees no longer bear the burden of proving that they merit release at their bond hearings; now, the burden has shifted to the Government to prove that release is not merited."  *Garcia*, 817 F. Supp. 3d at 127 (citing *Hernandez-Lara*, 10 F.4th at 41).  Today, *Matter of Guerra* is treated as helpful "guidance" as to how IJs are to conduct bond determinations.  *See, e.g.*, *Miti*, 2026 WL 884639, at *6 n.15; *Mayancela Mayancela*, 2025 WL 3215638, at *2-3.

criminal charges could present a risk of flight. For example, in *United States v. Neves*, the First Circuit found that a noncitizen charged with illegal reentry had "a strong incentive to flee . . . to avoid the near-certainty of a prison sentence followed by deportation." 11 F. App'x 6, 8 (1st Cir. 2001). Other factors weighing in favor of finding flight risk were that the noncitizen "ha[d] a lengthy criminal record in the state courts" dating back seventeen years, and that "[t]he weight of the evidence against [the noncitizen] on the illegal re-entry charge [was] strong." *Id.* The Second Circuit has similarly found that individuals "possess a strong motive to flee" where "they are charged with a serious crime that allegedly involved violence," "the evidence of their guilt, both direct and circumstantial, appears strong," and "if convicted, they likely face a lengthy term of incarceration." *United States v. Sabhnani*, 493 F.3d 63, 76 (2d Cir. 2007).

But once the criminal charges against an individual have been dismissed or dropped, that individual no longer has an incentive to flee. The facts of this case exemplify this well. Mr. Luis will not be standing trial, so he is not subject to a near-certain, potentially lengthy, prison sentence. He does not have any prior criminal convictions. And, perhaps most significantly, the evidence against him does not appear strong given that state prosecutors have declined to move forward with the charges. *See Neves*, 11 F. App'x at 8; *Sabhnani*, 493 F.3d at 76. Simply put, while dismissed criminal charges may be relevant for a finding of dangerousness to the community, they are generally incompatible with a finding of flight risk.

26

That just leaves the issue over the termination of Mr. Luis' SIJ-based deferred action and work permit.  The IJ found this to be an additional negative factor weighing against granting bond.  *See* ECF No. 13-18 at 5-7; *see also* Bond Hearing, at 48:45-50:05 ("[Mr. Luis] . . . has, in this court's view, a very highly speculative and unlikely path to relief from removal from the United States.").  The IJ reasoned that Mr. Luis' risk of flight was "further heightened by the lack or likely lack of viable relief" available to him "from removal from the United States."  Bond Hearing, at 48:45-50:05.

To be clear, USCIS has not revoked Mr. Luis' SIJ status itself.  *See* ECF No. 4 at 8 ("USCIS approved [Mr. Luis'] Form I-360, which granted [him] SIJ classification on September 20, 2024, and it remains approved.").  Rather, USCIS has terminated the deferred action that was granted as a part of Mr. Luis' approved SIJ classification, as well as the work permit associated with his deferred action.  *Id.*  Recall that deferred action "'is an act of administrative convenience to the [G]overnment which gives some cases lower priority for removal from the United States for a specific period of time.'"  *Primero*, 2025 WL 1899115, at *2 (citing USCIS, Policy Manual, vol. 6, pt. J., ch. 4 ¶ G.2).  According to USCIS's own Policy Manual, the agency "reserves the right to terminate grants of deferred action to SIJs 'as a matter of discretion.'"  *Id.* (quoting USCIS, Policy Manual, vol. 6, pt. J., ch. 4 ¶ G.2).  Indeed, that is precisely what happened in Mr. Luis' case.  *See* ECF No. 4 at 8 ("This letter serves as notification that [USCIS] has individually reviewed [Mr. Luis'] case and exercised discretion to terminate [his] period of deferred action[.]); *see also id.* ("USCIS intends

27

to revoke [Mr. Luis'] employment authorization because the condition upon which [his] employment authorization was granted no longer exists as [his] period of deferred action has been terminated.").

But therein lies the problem with the IJ's analysis.  Through its exercise of discretion, the Government has created the conditions leading to a flight risk finding. Specifically, the IJ found that Mr. Luis had a "very highly speculative and unlikely path to relief from removal from the United States" because the Government itself *chose* to terminate his deferred action.  Bond Hearing, at 48:45-50:05.  This effectively returned Mr. Luis to the position he was in before he was granted deferred action, thereby allowing ICE to proceed with attempting to remove him from the country. *See Barahona-Gomez v. Reno*, 236 F.3d 1115, 1119 n.3 (9th Cir. 2001) (recognizing that, while deferred action remains in place, the Government "takes no action 'to proceed against an apparently deportable [noncitizen]'"); *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 27 (2020) ("The defining feature of deferred action is the decision to defer removal.").

This essentially amounts to weighing Mr. Luis' legal status (i.e., his unlawful entry into the United States) against him.  But this can hardly be viewed as a negative factor weighing against granting bond given that *every* individual who appears before an IJ for a bond hearing lacks legal status.  Indeed, courts across the country have recognized that an individual's bond hearing fails to comport with due process where an IJ relies on considerations that would lead to an automatic denial of bond in all cases.  *See, e.g., Lemus Crispin v. Bondi*, No. 1:26-cv-191 (LMB/WEF),

28

--- F. Supp. 3d ----, 2026 WL 768859, at *5 (E.D. Va. Mar. 18, 2026) ("[A] noncitizen's unlawful status cannot provide a legitimate consideration upon which an [IJ] may deny a request for release on bond under § 1226(a) given that every individual who appears before an [IJ] for custody redetermination lacks lawful status."); *Segura Serrano v. Scott*, No. 2:26-cv-01268-LK, 2026 WL 1674357, at *7 (W.D. Wash. June 1, 2026) ("[The IJ's] rationale . . . suggests that *any* individual who entered the country illegally could be considered a flight risk and denied bond on that ground—but this would effectively transform discretionary detention into de facto mandatory detention."); *Zarei v. Larose*, No.: 26-cv-02335-GPC-MMP, 2026 WL 1415042, at *5 (S.D. Cal. May 19, 2026) (holding that an IJ's finding of flight risk was legally and constitutionally deficient given that the only piece of evidence presented against the noncitizen was the fact of his "entrance into the country without inspection").  It was procedurally improper, then, for the IJ in Mr. Luis' case to rely on this information in making her flight risk determination.

In summary, the Government presents no meaningful argument as to why Mr. Luis' continued detention remains reasonable or justified.  *See Demore*, 538 U.S. at 532 (Kennedy, J., concurring).  Mr. Luis has been found not to pose a danger to the community.  *See* ECF No. 13-10.  While he was found to pose a flight risk, the justification underlying that determination has "evaporate[d]" and become "weak or nonexistent," *see Zadvydas*, 533 U.S. at 690, 691, given that there are no longer any active criminal charges against him and that Mr. Luis' lack of legal status was improperly weighed against him at his bond hearing.  Put another way, the

29

Government's interest in detaining Mr. Luis "is no longer practically attainable" and his detention "no longer bears a reasonable relation to the purpose for which [he] was committed." *Zadvydas*, 533 U.S. at 690 (cleaned up).  His detention has therefore become an "arbitrary deprivation[ ] of liberty," which the Due Process Clause prohibits.  *Demore*, 538 U.S. at 532 (Kennedy, J., concurring).

The third prong of the *Mathews* calculus also "ultimately entails an assessment of the 'public interest.'"  *Hernandez-Lara*, 10 F.4th at 32 (quoting *Mathews*, 424 U.S. at 335).  The public interest considerations include "the administrative burden and other societal costs that would be associated with" granting additional process.  *Mathews*, 424 U.S. at 347.  This consideration also cuts strongly in Mr. Luis' favor.

"When the Government incarcerates individuals it cannot show to be a poor bail risk for prolonged periods of time . . . it separates families and removes from the community breadwinners, caregivers, parents, siblings and employees."  *Velasco Lopez*, 978 F.3d at 855.  "Those ruptures in the fabric of communal life impact society in intangible ways that are difficult to calculate in dollars and cents."  *Hernandez-Lara*, 10 F.4th at 33.  There is also a public interest in avoiding "expending substantial resources on needless detention."  *Id.* (citing *Velasco Lopez*, 978 F.3d at 854 n.11 (noting that detention of noncitizens "costs taxpayers approximately $134 per person, per day, according to ICE's estimates")).  As someone deemed to no longer pose a flight risk, Mr. Luis' case stands as a clear example of unnecessary detention.

The third and final *Mathews* prong therefore weighs in Mr. Luis' favor as well.

\* \* \*

As all three *Mathews* factors weigh in favor of Mr. Luis, the Court finds that the Government's continued detention of Mr. Luis violates due process.  Accordingly, the Court GRANTS Mr. Luis' Amended Habeas Petition.  ECF No. 15.

### D.    Remedy

Having concluded that Mr. Luis has successfully established a due process violation, the Court next considers what relief he is due.  In this area, courts have a fair degree of flexibility.  *See Morrissey*, 408 U.S. at 481 ("It has been said so often by this Court and others as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands."); *see also Siraj v. United States Sent'g Comm'n*, No. 19-cv-03375 (ABJ), 2021 WL 1061701, at \*6 (D.D.C. Mar. 18, 2021) ("Federal courts have the power and discretion under federal habeas to fashion a wide-range of appropriate relief.") (citing *Peyton v. Rowe*, 391 U.S. 54, 66-67 (1968)).  After all, habeas corpus is an "adaptable remedy," the "precise application and scope" of which changes "depending upon the circumstances."  *Boumediene v. Bush*, 553 U.S. 723, 779 (2008).

This Court has found that the appropriate remedy for a prolonged detention claim is immediate release.  *See Cruz*, 2025 WL 3295485, at \*11.  The Court has also held that once a noncitizen "has participated in two bond hearings" found to be deficient, "[i]t makes little sense to provide him with a third."  *Picado*, 2026 WL 352691, at \*7.  Accordingly, as it did in *Cruz* and *Picado*, the Court will order Mr. Luis' immediate release under reasonable conditions of supervision.

31

## III.    CONCLUSION

For the reasons stated, the Court GRANTS Mr. Luis' Amended Habeas Petition.  ECF No. 15.  The Government is hereby ORDERED to **release Sabino Luis Luis immediately** under reasonable conditions of supervision.  The Government shall also **file a notice of compliance** with this Order within twenty-four (24) hours of Mr. Luis' release.


IT IS SO ORDERED.


*s/John J. McConnell, Jr.*

_____
JOHN J. MCCONNELL, JR.
Chief Judge
United States District Court


June 17, 2026

32